Good afternoon, your honors. Timothy Presso for the appellants. May it please the court, this appeal brings us back before the court to address the U.S. Forest Service and Bureau of Land Management's approval for the J.R. Simplot Company to expand its Smoky Canyon phosphate mine into two roadless areas of the Caribou National Forest. Now the court has issued three orders in this case, but today for the first time the court is presented with a de novo determination of the environmental harms that are posed by this project, including not only the conversion of more than a thousand acres of undeveloped roadless lands into an industrial phosphate mine, but also the pollution of public waters with toxic selenium during a period spanning from five months to more than 420 years after project implementation. As the court is familiar with the case, I will turn directly to the issues concerning the defendant's violations of the Clean Water Act, the National Forest Management Act, and the National Environmental Policy Act in connection with their water quality determinations for selenium. To satisfy Idaho's water quality standard of five micrograms per liter for selenium, the defendant agency relied on two measures. The first was a circular cleanup of pollution from the existing mine, which was necessary to clear enough pollution from the affected surface waters to make room for new expansion, and the second was a store and release cover over the new mine expansion's waste rock. Reliance on both was arbitrary and capricious. First, with respect to the circular cleanup, the agencies relied on a Simplot contractor's conclusion that existing pollution at two springs feeding Sage Creek was attributed exclusively to the Pole Canyon waste rock dump and panel E at the existing mine. They determined that this Simplot conclusion was preliminary and, quote, one possible interpretation of the available data. Nevertheless, they relied exclusively on these measures to deal with an existing selenium problem, which has polluted streams at up to six times the legal limit. In so doing, they ignored readily available evidence before them indicating other, either additional or alternative, sources for the existing pollution. First, before the final environmental impact statement and record a decision in this case, the EPA sent a letter to the agencies notifying them that two other areas of the existing mine, panels A and D, were alternative potential sources of selenium to these same streams. Second, the Forest Service itself, an entirely separate part of its EIS, recognized that panel D was an additional potential contributor to these streams. Now, if you were setting out to do a rational determination of this selenium cleanup problem, you would say Simplot has presented us with one possible interpretation of the available data, but EPA has told us there are other potential sources and we ourselves have recognized that at least one of those sources is correct. We should weigh the various possibilities, determine which is the best documented, and make a conclusion accordingly. Counsel, there was a CERCLA settlement of sorts that was entered into. Has that been complied with and what has been done under that? To date, Your Honor, the CERCLA cleanup at the site has been quite limited. There has been a diversion of Pole Canyon Creek, which was a creek that of pollution at the mine have largely been unaddressed. There is no cleanup plan whatsoever for panels A, B, C, or D, and of course A and D have been identified, as I've said, as potential contributors to the pollution that exists in the surface waters today. You can look from one end of this record, which the defendants like to point out is so voluminous, you can look from one end of it to the other and you will not find any place where these agencies confronted the possibilities of some other possible interpretation of the available data, including the interpretation suggested by EPA and recognized by the agencies themselves. Your Honor, I'm a little confused now, but are panels A, B, C, and D newly approved panels? No, Your Honor, I'm sorry. How come you keep referring to them as, I mean, what can we do about A, B, C, and D, or what are we supposed to do about A, B, C, and D? Well, what we have to do, Your Honor, to comply with the law is clean up the surface waters so that when the new pollution from the mine expansion hits those surface waters, it won't aggravate the existing violations. Just a minute. So your position is that as part of the approval of the new panels, the agencies have the obligation to clean up the old panels? Is that what you're saying? It's not just my position, Your Honor. That's what the agencies themselves said because they recognized that unless you could clear out the existing violations, when the new pollution from the mine expansion hit those streams, it would exacerbate the violations and exceed the water quality standard and thereby violate the Clean Water Act. Well, I think the... Go ahead. I'm sorry. Well, I thought the objective was sort of, you know, not to aggravate whatever the existing level of selenium pollution was, not to have the new panels aggravate that. That's correct, Your Honor, but the only way you can do that... That's not enough? If it was rationally determined, it might be enough, but what Barp points to the Court today is it was not rationally determined because they relied on one view of the available evidence, which they themselves recognized was questionable, and that might be okay if they had looked at every other possibility and made a reasoned determination that those were not the better view and this one was, but you cannot find that analysis in the record. So, if you take the probable increase in the selenium and sort of that in the aggregate, are you still above or below the regulatory limits? You are above, Your Honor. The current pollution... And where's your best evidence of that in the record? Just point me. Well, in the FEIS, and I can provide you with a page site, there is indication that the existing selenium pollution has been recorded. It varies over the year, but each year it comes in a surge and it has been up to six times the legal limit, and the new mine, even if the cover performs as best as they hope, is going to contribute selenium to these streams at about half the legal limit. So, you combine six times the legal limit and half the legal limit, you get six and a half times the legal limit, which is, of course, unlawful, and I can provide the Court with a page site when I... I don't know if you'll play with what you're talking about. Your Honor, this was not just an issue of, did the agency say the right words in the right place, and is this a matter of just fly-specking an EIS? This is a matter... This is a critical point of water quality compliance for this mine. We've had 23 years of unlawful selenium pollution at this mine. Every single open pit phosphate mine in the region has violated water quality standards and is a circlicite. This is not a hypothetical concern, and the question is, are we headed for another one? And there's nothing in this analysis that gives the Court any assurance that we are not. Now, this is a classic arbitrary and capricious failure to consider a relevant aspect of the problem, and even more so, a failure to draw a rational connection between the facts found, that is, the panels A and D are potential alternative contributors, and the choice made, which was simply to rely on Simplot's one possible interpretation of the available data. I'd like also to turn to the issue of the store and release cover, the second principle mitigation. As to the store and release cover, any rational assessment of this mitigation measure had to look at the seasonal performance issue. The principle mechanism that's injected selenium into the streams is the seasonal surge of snowmelt and precipitation at this high elevation site. About two-thirds of the annual water inputs to this system come in a few short weeks each spring where there is snowmelt and precipitation. Now the arguments have created a lot of confusion on this issue, and I want to make a couple points clear to show that, in fact, the agencies did not engage in that analysis here. The first is, was the modeling seasonal? I don't think there's any dispute that the modeling was fed seasonal inputs, but produced only an annual average output. There was a request by Carlson, I guess, to do a 30-day analysis, and that was never done. Is that correct? That is correct, Your Honor, and that's the focus of our concern, because the seasonal outputs were critical. Now the government says it doesn't matter whether there was this 30-day segmentation of the information, because we have an annual output figure, and all they would have done was divided it up into smaller segments, and it would have been a more intimate result. The problem with that is they are not paying attention to what the modeling, by the modeler's own statement, was intended to do. As the modeler said, the modeling was not useful for its quote, absolute results, but only quote, as a tool to understand key processes and characteristics that will influence performance of the cover system. The agencies here focused on the absolute result, and didn't require modeling that would illuminate the key processes and characteristics of the cover system. So they ended up not having a basis to apply their expertise. They make a lot of argument about it, we're the experts, we get to decide this, but if you have no seasonal outputs to consider, what do you have to apply your expertise to? The agencies ended up relying on an annual output figure that came out of a black box, essentially. And they say, well, the annual figure looks good to us, but unless you know how the model dealt with the seasonal inputs, and what the seasonal performance of the cover was predicted to be, how can you trust the annual output? Now, the government also says, well, that's fine, Dr. Carlson said this, and he was one member of a 25 member review team, and who cares what he said, because we get to choose our experts, and we choose the other ones. But that is not an accurate representation of the record in this case. If you look at the record, what you see is the other scientists did not say, we don't care about the seasonal performance information. We think an annual output figure is enough. They did not say that. What they said was, the modeling limitations, quote, led to uncertainty within the technical review team about the short-term accuracy of the modeling results. So they acknowledged that there was this concern about the accuracy of the modeling results. The defendants say, well, it was only short-term accuracy, and this is a long-term process, so let's not worry about that. But the whole ballgame here is short-term. It's a few short weeks each spring that yield this huge deluge of water into the system. And so the agencies did not say it doesn't matter about that seasonal pressure. What they said was, we'll come up with a different way other than modeling to resolve this. We'll authorize the mine, we'll monitor what happens, and we'll see what kind of pollution results. Now that's a decision to authorize pollution without considering all relevant factors as to the performance of the cover. And that is not a matter for this court's deference to expert decision-making. That's a matter for this court to enforce the law. I also want to turn briefly to the question of remedy. One of the suggestions I think that was made, I don't know if it was adopted though, was in response to that criticism, was that well, you know, we're gonna we're gonna do this testing as we go along for several years later, and we're gonna set aside money or have it bonded or something like that, so that if it's not working out, we can make whatever changes are necessary. Yes. And what's your response to that? Well, they do have this sort of, this is their argument that basically says, we'll figure it out. The pollution is a long way away, it's gonna take a long time to get here, and we'll make three points. The first is, they rely on the modeling results for the flow of pollution from panels F and G, the newly authorized panels. What they don't look at is, the initial waste rock from this mine is being dumped into the E0 pit at the existing mine. They did not model the flow of pollution from the E0 pit, but they accepted a Simplot contractor's assertion that it would take four to five months for that pollution to reach surface waters. So this idea that we have all this time that we can sit back and watch and see what happens and correct problems, that is not accurate with respect to the first, right out of the get-go, what they're going to do on this mine. The second is, I think the court is presented with a question, is it okay to authorize pollution and say, down the road someday we'll figure out how to deal with it? Is it okay for the agency to authorize this massive environmental disturbance with a track record that's abysmal on water quality compliance and say, on a hope and a prayer, we'll get this figured out someday? With all due respect, that is not a rational way for the agencies to proceed. It's arbitrary and capricious and it's a proper role for judicial intervention. As to the remedy, we are mindful that the court in June 2009 allowed Simplot to begin implementing this project. However, in doing so, the court emphasized that its judgment was based on an assessment of competing harms likely to be suffered before a final judgment, quote, not the permanent harm likely to be suffered if the coalition ultimately prevails. Today we confront the permanent harm. And that consists of the development of the roadless lands, more than a thousand acres, but also the selenium pollution. Now the government has said, and we agree, that vacator alone is a sufficient remedy. And the Supreme Court's decision in the recent Monsanto v. Geertsen seed farms case emphasizes this point that if a vacator will provide all necessary relief, that there's no reason for the court to address the extraordinary remedy of an injunction. That said, an injunction is fully warranted. In my brief time left, I want to highlight two points. We have put in the record before Your Honor a document that we introduced in the district court solely for remedial purposes, which is a December 2008 letter from the Forest Service that calls into question every one of the assumptions they relied on, themselves, only six months earlier, to say that the circular cleanup would address the existing pollution problem. They said Polk Canyon doesn't look like it's working, that remediation doesn't appear to be working, and Panel E cannot be proven to be the source. I see that my time is expiring. May I make one last point? Finally, please. The very last point is there's been a lot of assertions in this case that the selenium problem really isn't that big a deal and we shouldn't be that concerned about it because everything is going well at the mine. Simplot's own fish tissue data, which we've provided to the court, shows that 92% of fish, brown trout collected in the affected surface waters, had selenium tissue levels in their bodies such that a significant portion of their eggs would be too deformed to survive. Selenium poisoning is killing fish and polluting water and we ask this court to correct that problem. Thank you. Thank you, counsel. Good afternoon, your honors. May it please the court, I'm Justin Pittot on behalf of the United States. With me at counsel table is Albert Barker on behalf of Simplot and David McGuire, who represented the counties and other organizations, labor unions, etc. Before we begin, do you have a time agreement? We do, your honor. I'm going to be taking 12 minutes. My colleague, Albert Barker, will be taking three minutes. Okay, very good. Go ahead. Thank you. I'm here on behalf of the United States, as I said, once again, to discuss the Smoky Canyon mine. I will turn to the issues in the order that Mr. Presso turned to them. I think by way of beginning to think about this, the government was really, was confronted with a difficult problem in considering this mine for this reason. These phosphate leases are pre-existing. Simplot has a vested right in these leases to develop them if they can do so in a way that is approvable under the law. So on the one hand, we have these vested rights that we have to consider. On the other hand, we have a very complicated environmental situation here because of the existing mine. And so what the agencies had to do was come up with reasonable estimates, sort of a reasonable assessment of the available information to determine what the world would look like decades from now when selenium pollution from the expansion is Would you tell us what has been done to comply with the CERCLA so-called settlement? Certainly, Your Honor. So there's several different CERCLA agreements on consent that have been entered into between Simplot and various agencies, EPA and the Forest Service being the two federal agencies that are involved. First, there was a site investigation portion of this cleanup. And during that process, sort of preliminary investigation was done to identify various areas that were likely to be We know that there's pollution and that there's six times the legal limit. So have they identified the sources of this selenium pollution? Well, they've certainly identified two very significant sources, the Pole Canyon area and Panel E. It is true. I think what the EPA letter that GYC relies on says is we can't rule out absolutely other sources. It's possible that Panel E and Panel D Are not the only sources. Right. There could be other sources. But we know that Pole Canyon and Panel E are very significant sources. Now, what have they done there? In those two places, in Pole Canyon, they implemented a remedy. So basically, what you have in Pole Canyon, you have essentially a canyon with a stream running through it. Early on in the mining, overburden containing selenium was basically just poured into the canyon, filling it up. And the stream, as it passed through the overburden, would pick up selenium. In order to address that problem, the stream was essentially diverted around the canyon. And that happened just before and sort of around the time this project was authorized. We talked about it a little bit a year ago. And now, where have they diverted it to? And will that eventually get its way into the water systems? So basically, what's happened is that the stream is diverted right above the overburden disposal area. And it's piped around this disposal area. And then it reenters the Pole Creek below. So it sort of avoids the overburden disposal. But otherwise, the creek continues uninterrupted. So the Pole Canyon Creek is no longer encountering this waste rock. Is it working its way to other water systems? What's happening? So once it reenters Pole Creek, it just continues along Pole Creek. I think it then eventually enters Sage Creek and continues on its way, I think, eventually to the Snake River and to the Columbia River. So the stream itself isn't disrupted except in that one place. Basically, there's like a new channel. There's a pipe that just takes it around the disposal area and puts it back in the creek. And it continues on its way. So I think the estimate is that that reduced the amount of water contacting the overburden in Pole Canyon by 97, 93 to 97 percent. There's still some rain that will fall on top of the waste rock. And that will pick up some selenium. But since that has been implemented, my understanding is that Pole Creek has not been in excess of the water quality standards. So it has had a dramatic effect on Pole Creek. With respect to Panel E, which is sort of the other aspect that has been addressed, part of that remedial, that cleanup plan is attached to this project. There's this open pit, Pit E0, which was referenced, which as part of the existing mine was allowed to remain open under the previous decisions. And as a result, water sort of collects in the open pit and was able to pick up selenium and take it to surface waters. That has been backfilled. I believe the backfilling is largely complete. It will then be capped. That's estimated to reduce the amount of water that's picking up selenium by about 80 percent from the Panel E. That in conjunction with other efforts at Panel E. So there are some things that are going on. In addition, I think it was 2009, there was an additional agreement on consent entered between Simplot and the EPA and Forest Service to begin a remedial investigation and feasibility study for the remainder of the area. So I believe that is expected to go on until maybe 2011 or 2012, doing further investigatory work to see if these other sites are important contributors of selenium, and if so, to develop a response. Now at the current time, is six times the legal limit still exists, and where? So the six times the legal limit number only occurred during one month, May 2006. So there was one month when the selenium conditions in Sage Creek were as bad as six times the legal limit. Otherwise, selenium in Sage Creek fluctuates from just under the legal limit to, I think it's 1.6 times the legal limit. So we still clearly have a problem in Sage Creek, and that is attributable to Tee Springs, the Hoops Springs, and the lower Sage Creek Spring. The issue is that we're not actually beginning to see the results of the current work that's been done at those springs. It's estimated that the Pole Canyon diversion, for instance, which, and Pole Canyon is a source of selenium at Hoops Springs, but it's going to take about 10 years to actually see the results at the spring, because that's about how long it takes selenium to move from Pole Canyon through the groundwater into Hoops Springs. And so what we're seeing now is we're continuing to see sort of the selenium from a decade ago before this work was done. However, by the time, 10 years from now, when success is going to be, you know, we'll be seeing the fruits of that effort, we're still not really going to be seeing any selenium from Panel F and G in Hoops Springs or south of Sage Fork Springs. In a matter, it's really going to take multiple decades for that selenium to be arriving in surface waters. And if you look at, there's a chart in the excerpt of record at 729, which sort of has these curves to show the way that, when we expect selenium from Panel F and G to be arriving in surface waters. And that shows that in the first few decades, it's virtually none. It sort of ramps up. It's hard to tell, probably 20 to 40 years. You know, the increment of the chart isn't quite fine-tuned enough for you to be able to say exactly when it is, but certainly within the first 20 years, it's virtually no selenium that we're expecting from Panel F and Panel G. Now, the Yellowstone Coalition's response is, but there's also this Pit E0 situation. And that's a situation that I was just addressing. It's a current problem. It's a problem that's associated with the existing mine. The thing is that the backfilling of that pit and the covering of that pit is part of the cleanup effort. It's not going to worsen water quality, the water quality issue. And I don't think that you can read the briefs that have been filed in this case to suggest that it's going to worsen the situation. It's true that the link between groundwater there and surface waters is closer than from Panel F to surface waters. But really what's going to be happening there is we're going to be seeing an improvement in water quality. Let me ask you to turn to the issue which seems to be quite critical, and that is the seasonal uptick in the, you know, when the snow melts and there's a huge flow. Absolutely, Your Honor. Clearly, the weather patterns in this part of the country, in southeastern Idaho, are such that most of the annual precipitation is going to be happening in the spring. That's going to be runoff from snow as the snow melts, et cetera. So you're going to have a lot of water that needs to be dealt with at that time. Why was there resistance to the modeling by the month? It wasn't going to take many additional days. Was it that people didn't want the answer to that? No, Your Honor, I don't believe that was the case. It kind of looks that way if you look at the record. Well, I think there is conflicting information about how long the additional There are two different kinds of models that were being run. There was this one-dimensional model and there was a two-dimensional model. The one-dimensional model looks at sort of a slice of the ground and what rate is water going to pass through the cover, and the two-dimensional incorporates slope length. The one-dimensional modeling would have taken a relatively short period of time. But what Carlson really was asking about was two-dimensional modeling, and that would take a much longer amount of time. How long? Up to, I believe, 100 days of additional computer time. So just once you start the model, it could take 100 days of the computer just spinning. Something between three and four months. That's correct, Your Honor. Now, what additional knowledge would we gain from running it on the 30-day schedule, which was suggested? Well, I think if you look at the record, and there's sort of this page of this memo that I think both the government and GYC are paying a lot of attention to because it's where the other members of the technical review team address this issue. What would be gained? What would you learn from that? So what you would learn is during, so right now we have an estimate that .6 inches of water a year are going to pass through the cover. You would learn that, say, .4 of that inches were going to happen in March, and the other .2 would be spread out through the rest of the year. So that would be what you would learn is you would see which months, during which months would that .6 inches of rain or percolation are expected to occur. Now, the important point is that … Given that the problem is seasonal, why isn't that important data? Well, the reason it's not important is what I was just going to turn to, is because while there may be seasonal amount of water up above, all of this ground that water has to pass through is going to dampen any variation at the surface. So even if all .6 inches of water were going to pass through in January, or say March, and nothing was going to happen the rest of the year, at this interface between rock and groundwater, you would see exactly, you'd see a steady amount of water coming out. And you know that because of other modeling, the CW model that was conducted, which is unchallenged. So if we look at that and we see, wow, in May it's likely to be 20 inches, what do we make from that? Well, so I think that, this is an important point, Your Honor. That could not be the result of rerunning the model. Because the model itself, pardon me, looks at every single day. The model runs continuously. And so the model is predicting how the cover will respond seasonally. It's just aggregating all the information for those 12 months, in fact every day, into a year and then putting out the data. So all you could see, all that could happen, is that we would see the .6 inches divided up over the year. Okay, now if we did the one that's on the angle and would take something over three months, what do we learn from that? We'd be in exactly the same situation. Rerunning that model, again, you would see, I think that estimated a slightly lower amount of percolation. And you would see that slightly lower number spread out over the course of a year. So all the agencies would learn is when during the year the already predicted amount of percolation is likely to occur. And that information is not related to the decision. Because the question here was at what rate and when is selenium going to be emerging in the surface water? And that is going to be at a constant rate, irrespective of whether or not there are fluctuations in monthly percolation or even annual percolation. Now, if we were to assume that you're going to get this excess runoff and no way of handling it in your six feet of stuff, what happens? Well, I'm not sure what the basis for that assumption would be, Your Honor. The modeling addresses this question. I mean, I think the question that Dr. Carlson was focused on was, well, do I trust the model? That was sort of his... Well, that's not really, I'm putting Dr. Carlson, I'm just trying to understand this myself. Absolutely, Your Honor. Okay. Am I correct that there's going to be some excess runoff in some months? Possibly not every year, but in some months there's going to be very excessive runoff, okay? Do you mean runoff off the top or through the cover system into the groundwater? I don't believe that's correct, Your Honor. I don't think there's any evidence in the record that suggests that more water is going to be passing through the cover or at least entering groundwater than is predicted in the models. You can question whether the models are accurate or not. You're saying it's going to run over the top? Well, I think several things will happen. Some of it will run over the top. I mean, for instance, when snow melt begins and you imagine the ground is still frozen, almost all that water is just going to slough off of the top. Some of the water will be absorbed and later released either through evaporation or transpiration. And so there's sort of different mechanisms that are going to be going to go, different ways that the cover is going to handle. I'm using up all your time. Your colleagues have no time. We're going to give Mr. Barclay some time to go ahead and answer the question and finish his thought. I don't know whether I answered your question, Your Honor, but I'm happy to say more about this if that would be helpful to you. Well, I don't think I understand it, but I don't think more dialogue at the moment will be helpful. Well, I will commend to you, Your Honor, there's a memo in the record from Knight's Peasfold, which is a consultant that the government's hired to sort of double-check this information. And that appears in Excerpt of Record 714. And the government posed this very question to the consultants. And they said, because Dr. Carlson had raised this question about seasonality. And the government said, well, is it true that the model is just sort of averaging everything out and not taking account of seasonality? And the consultant said, no, that's not right. What's happening is the model is going day by day, it's predicting what's going to happen, and it's just sort of keeping a running total. And it spits out the running total at the end of the year. So we would expect to see no difference whatsoever in the overall estimate of the amount of water passing through the cover system. Right. But I think as Dr. Carlson, my recollection is correct, he also was concerned that there was a temporal limit to the predictiveness of the model. That is, after a certain period of time, that it was of less use. So in that time period, I think he was talking about what you're talking about, which is after five or ten years, then the model ceases to be useful, right? Well, I think Dr. – I will note, I don't think that's an argument that's ever been directly raised, but I think Dr. Carlson did have some – make some comments to that effect. Though Dr. Carlson wasn't really – I mean, he and the technical review team were learning about this model as the process went forward. You know, the government actually used a different model, the HELP-3 model, which is a slightly less sophisticated model to do some of the preliminary work. I think they were all more familiar with that. They became familiar with the Betos-W model by consulting with the O'Kane consultants who were running the model, and also they consulted with the model developer, other experts. They consulted – they hired their own consultants. And so through that process, they became familiar with – more familiar with the model. This model has been widely used. It's been widely acclaimed. It's viewed as the best model for dealing with this kind of situation. And I don't think the GYC has any suggestions of what other models could have been used. I mean, this is really the best way to estimate – to predict the performance here. And so, you know, I think if you think about it from the agency's perspective, this is the best they could do. And it's enough because these conservative input estimates, the outputs are predicted to be more protective than necessary. And there is – there are sort of ongoing opportunities, for instance, through the quality assurance, quality control process, to fine-tune things if necessary. So I think the agencies approached this very cautiously. They said this is the best model we can come up with. This is the best information we can come up with. We recognize this isn't foolproof. And as a result, we're going to also require monitoring. We're going to require a quality assurance, quality control test. The first phase of that has now been complete. We're moving into phase two relatively soon. And if you look at this from the perspective of the APA, this is a reasonable way for an agency to proceed in the face of a very difficult analytic challenge. And that is – I think that is something that this Court should defer to. This is an agency exercising its expertise to try to answer a question. Thank you, counsel. Thank you very much. Berkley. Why don't you put Abe Bennis on and we'll move to Mr. Pressel. Thank you, Your Honor. You don't need to use it all, but we'll put Abe on there for you. Keep going. Thank you, Your Honor. I would just like to take my time to respond to the questions of the panel if I could. I think that the thing to understand about the geologic nature of this site is it's very important to understand what's going on here. This is not a mine that's located immediately adjacent to a river separated only by a gravel sandbar. It sits up – panels F and G sit on top of a hill above the streams. Panel F and G are to the south of South Sage Creek, and the water from Polk Canyon is to the north of that, and then to the north of that are panels A through D. Panel E is immediately west of Hoop Springs and South Sage Springs. Did I say west? What happens is the water comes down from the mountains and it hits this groundwater divide, or it hits a clay layer in the valley below. When it hits that clay layer, the groundwater goes either north or south. This is in the record. The evidence is that the groundwater in the panels north of Polk Canyon flows to the north, and the groundwater from Polk Canyon flows to the east, and then it hits that divide and flows south to the Hoop Springs. When the water was infiltrating from Polk Canyon into the overburden that was placed there, and it was placed there, by the way, with agency approval. It wasn't just Simplot dumping stuff there. That was what the mine plan was, and it wasn't an issue at the time when it was approved because of the fact that selenium contamination was not known to have been a significant problem in these phosphate mines at that time. It only came later that required these remedies. Here's my citation to the record. It's page 7-145 of the FEIS, our supplemental excerpts of record at page 251. That's where the record indicates that the groundwater north of Polk Canyon is flowing to the north. It's flowing away from Hoop Springs because Hoop Springs is down here below. Then you've got panel F and G further to the south. We all know, and the record is clear, that panel G has no connection whatsoever with South Sage. There's no groundwater connection. There's no surface water connection. There's no connection of any kind. So panel G has got nothing to do with this discussion. The question is, if the water from panel F, how long is that water going to take to get to South Sage? Because there are springs on both sides of Sage Creek, or South Sage Creek, from the north and water coming from the south, which is the direction of panel F. So you've got the mine sitting high up above the stream. You've got water that percolates down, and the way this cover is designed, you've got half an inch of percolation per year that comes through the cover. That's 8 feet. Then you've got 100 to 130 feet of overburden, and the rate according to the FEIS at which water percolates through that is 2 inches a year. And then you've got up to 1,200 feet of limestone, bedrock. The water has to percolate through that, and then the water gets to the groundwater system, and then from there it has to travel from 1 to 4 miles to get to the South Sage Springs. So the idea that whether or not we've got one inch or half an inch, or of that half an inch, whether or not a quarter of an inch comes in March into the cover, is the agency's determined was not particularly relevant or important because of the dampening effect of all of that cover, the limestone, and the overburden material, and then the travel time. So that's why you see 100 plus years of travel time from Panel F to South Sage. So the question that you asked Judge Fletcher about how long the water takes to get, or what happens when you have an extraordinary amount of water, you do have most of the water being handled through runoff, and that water goes into a stormwater management system. That stormwater management system is permitted, has a stormwater permit that was subject to a 401 certification. So the question is, all right, so we have instead of half an inch, what happens if we have a whole inch of percolation because of this? And again, because of the depth to groundwater, all of this is dampened out, and that's what the agency's found. So the next question is, if you have this, did Carlson want some additional analysis? And as Mr. Pideaux stated, and there's this Knight-Peasold argument, our response to Carlson's questions, the agency then took the questions to the independent expert and said, what is it we need to do about this, about his questions? So they didn't entirely fail to consider this question at all. They did consider it, and Knight-Peasold said the model is fully seasonal, it provides us with daily output information, and there is no need to do any more confirmatory runs because we know what the outcome is going to be. So the agency goes to the expert and they say, what do we do about this comment from our internal review? And the expert says, we've got the information we need. That is not arbitrary and capricious for them to go ahead and make that decision based upon the independent outside advice of an expert. Are you telling us that the issue of seasonal data is answered? Yes, Your Honor. The issue of seasonal data is fully included in the model, and if you read any or all of those model reports that are in the record, and we've added a supplemental excerpt of records that are supplemental excerpts one and two that lists two full pages of those. All of those records recognize that seasonality of runoff and spring snow melt was the issue that had to be dealt with in this model. So the model did consider it. The fact is Carlson questioned whether or not the consideration was adequate, and the agencies went to the outside experts and they said, we've got what we need. Thank you, counsel. Go ahead, you've got a few seconds. I was just going to say on the question of remedy, if the court gets to the point of having to return this case to the agency or the district court, we think that the question of whether or not an injunction should be issued under the standards of Winter and Monsanto is a question that should be addressed in the first instance to the district court based upon because that court has not had the opportunity. Let me just ask this one question. If we were to decide to return it, I'm not deciding whether we would or we wouldn't, but if we did, would you be able to proceed with Panel G? I think, Your Honor, that would be a question for the district court to evaluate as to whether or not there would be an impact. If we entered a vacater, that's up to the district court to fashion a remedy. That's correct, Your Honor. Thank you. Okay, Mr. President, why don't you put five minutes on the clock. Thank you very much. A few brief points. What Mr. Barker described for you in great detail was Simplot's conceptual site model of how the water flow at this site works. This is essentially their story that we've got it figured out. We understand this site and we know how we can take care of the problem. The difficulty is, if you look at that December 2008 letter that the Forest Service sent to Simplot, on page 154 of volume 2 of the excerpts of record, what you'll see is they're discussing Simplot's conceptual site model. What they're saying is, the current conceptual model has continued to emphasize contaminant migration along discrete fracture zones. Even though groundwater wells drilled in the vicinity of the probable fault have not intercepted any primary flow paths for contaminant transport, an additional groundwater monitoring well was also unsuccessful in intercepting a primary fracture flow system for contaminant transport. We don't have it figured out. The agency is saying, your conceptual site model doesn't look like it's right. That's why we're proposing to you an alternative conceptual site model. The problem is, this entire mine authorization is based on the conceptual site model that Mr. Barker described in great detail. It's based on a house of cards that the agencies now themselves don't believe. Six months after they authorized this project, they turned around and said, well, everything that we said in authorizing this massive disturbance looks like it was wrong. It's not a question, though, your honors, I want to make this very clear, of judging the agency decision based on something that happened after the decision. Rather, it's a product of the agency not examining all the relevant data at the time it made its decision. That's what we're asking the court to address. Also, Mr. Barker said, and Mr. Pito said, the problem at Pole Canyon is fixed. If your honors look at page 166 of the excerpts of record, you will see a table of the selenium flow through the Pole Canyon site after this remediation that they have trumpeted. And what you'll see is in May of 2007, the selenium load of pounds per day was 5.59 pounds per day. The selenium load in 2008 was 11.62 pounds per day, almost double. That's not a problem that's been solved. This is after the Pole Canyon remediation that the other side persists in saying that has taken care of the problem. Also, there's been a lot of talk here about the extremely long times that it takes for selenium to flow from this site into surface water. Two things about that. They persistently talk about peak selenium flows. The violation is not confined to peak flows. The violation, given the existing pollution problem, is the first injection of new selenium into the system, and that's much quicker, probably approximately 20 years. 20 years maybe sounds like a long time. We've had 23 years of pollution at this site already with no clear path forward in sight. We still don't understand the groundwater flow situation. And then there's the E0 pit. Mr. Pideaux says, well, we're taking care of that with this backfill, and it's not going to make problems worse. We don't know. They didn't model it. Even though that E0 pit is the first waste dump, they didn't model how pollution will flow from that site to the surface waters. The government doesn't know, and I don't know. The only thing we have is what Simplot's contractor said, which the agencies accepted in this decision, which is on page 733 of our excerpts, which says a slug of this water from the floor of E0 to the springs could travel within four to five months. That's the only thing the record tells this court. It's not 100 years. It's four to five months. Counsel, do you have any comment on this panel G? Is it completely separate? It is not, Your Honor, because panel G, the streams flow into Crow Creek. Crow Creek is polluted as a result of the inflow from Sage Creek. They're not separate, mutually exclusive water bodies. It's an interconnected system, and the pollution flows throughout the system. And then the last point I want to make. When the court looks at this picture, what it sees is an agency that hasn't got all the answers. Requiring a remand and a reconsideration is not an empty exercise. If the agencies have to go back and look at this now, they can bring to bear the new conceptual site model, the new information about panels A and D and B and C, the new potential sources they've also identified. It's an important analysis before we authorize yet another selenium site in this region. Thank you very much for your consideration. Thanks for the court's special effort to hear this case in a timely fashion. As the court may know, there's a stipulation between the parties that confines ongoing work to a certain footprint until December. We ask the court for a timely ruling, but we appreciate the court's time. Thank you, counsel. Thank you all for your arguments. The case is hereby submitted.
judges: Fletcher B. , Tashima, Thomas